UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN JONES, KEVIN KISSEL,　　　　Case No. 2:23-cv-
and DANA PIAZZA,　　　　　　　　　HON.
　　　　　　　　　　　　　　　　　　MAG. JUD.

　　　　　　　Plaintiffs,

vs.

CITY OF BURTON, BRIAN ROSS,
DUANE HASKINS, CHARLES ABBEY,
and JOSHUA LEADFORD, individually
and in their official capacities,
and jointly and severally,

　　　　　　　Defendants.

_____

GARY T. MIOTKE (P41813)
Attorney for Plaintiffs
6828 Park Avenue
Allen Park, MI 48101
(313)-388-4809
gmiotke@miotkelawoffice.com

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COME the Plaintiffs, by and through their attorney, and for their

Complaint they state that:

## JURISDICTION, PARTIES, VENUE

1. This action arises out of the Plaintiffs' employment by Defendant, CITY

OF BURTON.

2. Count I is an action to enforce civil rights pursuant to 42 USC 1983.  This Court has jurisdiction over Count I pursuant to 28 USC 1331 and 28 USC 1343(a)(3) and (4).

3. This Court has jurisdiction over Count II, Count III, and Count IV by virtue of the doctrine of supplemental jurisdiction, 28 USC 1367.

4. Plaintiff, KEVIN JONES ("Jones") is a resident of a municipality within the County of Genesee, State of Michigan.

5. Plaintiff, KEVIN KISSEL ("Kissel") is a resident of a municipality within the County of Genesee, State of Michigan.

6. Plaintiff, DANA PIAZZA ("Piazza") is a resident of a municipality within the County of Genesee, State of Michigan.

7. Defendant, CITY OF BURTON ("City") is a Michigan municipal corporation that exists by virtue of the laws of the State of Michigan within the County of Genesee, State of Michigan.

8. Defendant, BRIAN ROSS ("Ross") is a resident of a municipality within the County of Genesee, State of Michigan.

9. Defendant, DUANE HASKINS ("Haskins") is a resident of the City and thus the County of Genesee, State of Michigan.

10. Defendant, CHARLES ABBEY ("Abbey") is a resident of the City and thus the County of Genesee, State of Michigan.

11. Defendant, JOSHUA LEADFORD ("Leadford") is a resident of a municipality within the County of Genesee, State of Michigan.

12. The events giving rise to this case arose in the County of Genesee, State of Michigan which is within the Eastern District of Michigan, Southern Division.

<u>BACKGROUND FACTS</u>

13. For all times material to this Complaint, Jones was employed by the City as a Police Lieutenant and remained so employed until the wrongful termination of his employment as described in this Complaint.

14. For all times material to this Complaint, Kissel was employed by the City as a Police Lieutenant and remained so employed until he was wrongfully double demoted to the position of Patrol Officer and deemed ineligible for promotion as described in this Complaint.

15. For all times material to this Complaint, Kissel also served as the President of the Burton Command Officers Group ("BCOG").

16. The BCOG is affiliated with the Police Officers Labor Council ("POLC") and is the union that represented and represents the bargaining unit for the Detectives, Sergeants and Lieutenants employed in the City's Police Department.

17. Kissel is now employed by the City as a Patrol Officer.

18. For all times material to this Complaint, Piazza has been and remains employed by the City as a Patrol Officer.

19. For all times material to this Complaint, Ross has been and remains employed by the City as its Police Chief.

20. For all times material to this Complaint, Haskins has been and remains the Mayor of the City.

21. For all times material to this Complaint, Abbey has been and remains the City's Human Resources Director.

22. For all times material to this Complaint, Leadford has been and remains the City's labor attorney.

23. Starting no later than December 2022, each of the Plaintiffs became aware of information causing them to believe that Ross was engaged in an at least inappropriate and possibly physically intimate relationship with a female Patrol Officer who will hereafter be referred to as "Officer #1".

24. For example, in December 2022, various employees of the City's Police Department were at a Red Wings' game, including Ross, Officer #1, Officer #1's husband, and Piazza.

25. Piazza and her then fiancé joined the group late at the game and had to sit in the middle nearest to Ross.

26. Upon their arrival, it was clear that Officer #1 and Officer #1's husband had been arguing based on their demeanor.

27. Strangely, Ross was also texting low between his legs.

28. At one or more points during the game, Ross's phone was facing Piazza and/or her then fiancé such that it was plainly visible to one or both of them.

29. As such, Snapchat messages were observed by Piazza and/or by her then fiancé that appeared to be between Ross and Officer #1.

30. One exchange of messages was:

Ross: "Are you okay love?"

Apparently Officer #1: "No I fucking hate him".

31. Another exchange of messages was:

Message: "Love you".

Reply message: "Love you more".

32. Jones and Kissel also were and/or became aware of information causing each of them to also believe that Ross was engaged in an at least inappropriate and possibly physically intimate relationship with Officer #1.

33. For example, Ross repeatedly insisted that Jones should do things for Officer #1 to be selected as "Officer of the Year" even though Jones told Ross repeatedly that he believed another employee of the City's Police Department should be so honored.

34. Also for example, Kissel saw that Ross had gone into Officer #1's office after normal work hours for an extended period where there did not appear to be any legitimate reason for the two of them to meet in this fashion and then Ross and Officer #1 came out of the office after this extended period.

35. Due to their reasonable concerns that certain information and/or items would ultimately be relevant to a possible sexual harassment and/or sexual discrimination claim, Jones and Kissel did take some steps to preserve this evidence, which actions were protected under both Title VII and Michigan's Elliott-Larsen Civil Rights Act.

36. Further, other employees of the City's Police Department became aware of information causing them to also believe that Ross was engaged in an at least inappropriate and possibly physically intimate relationship with Officer #1.

37. Moreover, other evidence of such a relationship continued to surface, including other information demonstrating that Ross was showing favoritism to Officer #1 in the process to promote a new Sergeant in the City's Police Department.

38. On or around April 5, 2023, Officer #1 wanted to complain about someone allegedly placing a copy of the anti-nepotism policy in her mailbox.

39. Although there did not appear to be any violation of policy associated with this action or any known or alleged "offender", Ross insisted that Jones

should meet with her to let her blow off steam and said that Jones did not even need to document this.

40. On April 5, 2023, and consistent with Ross' directives, Jones met with Officer #1.

41. Strangely, and inconsistent with normal practice, Ross also participated in the meeting.

42. During this meeting, and as described below, Officer #1 and Ross stated things that greatly alarmed Jones.

43. Therefore, Jones sought guidance from his union and otherwise on how to address this situation.

44. Thereafter, on May 2, 2023, Jones sent an email to Haskins, Ross, Abbey, City Attorney Amanda Doyle, and Leadford that was a complaint/notice made under the City's Police Department sexual harassment policy and Title VI.

45. As such, this email was protected under Title VII as well as under Section 701 of Michigan's Elliott-Larsen Civil Rights Act.

46. Other than the redaction of Officer #1's name, the pertinent substance of the email was:

Mayor Haskins, Chief Ross, Mr. Abbey, Ms. Doyle, and Mr. Leadford:

This is a complaint/notice of sexual harassment that I am submitting to you to comply with the Burton Police Department sexual harassment policy and Title VI. I am submitting this complaint/notice to all of you because I am unsure how to proceed given Chief Ross' involvement in this matter.

I am not providing as much detailed information as I otherwise could provide because Chief Ross is a recipient of this email.  Given Chief Ross' involvement in this matter, I do not want to compromise the anticipated investigation of this complaint/notice.

The gist of this complaint/notice is as follow: On April 5, 2023, I met with Chief Ross and [Officer #1] related to her concern that she found a copy of the nepotism policy in her mailbox.  [Officer #1] stated several times and loudly that someone might have done this "because everyone thinks that I'm sucking the Chief's dick".  Chief Ross turned toward [Officer #1] and said, "I like getting my dick sucked."

I await your direction with respect to next steps related to this complaint/notice and any investigation of it.

Thank you for your attention to this matter.

Respectfully,

Lt. Kevin Jones

47. Starting on or around May 2, 2023, the City began to investigate Jones' complaint/notice.

48. As described below, this investigation began as an investigation of the Jones' complaint/notice, but the Defendants thereafter morphed and perverted it into something much different for their own unfair and unjust purposes and in unfair and unjust ways.

49. Further, the Defendants' perversion of the investigation began prior to the announcement of the purported end of the investigation of the Jones' complaint/notice and included the investigation of Jones', Kissel's, and/or at least

one other employee's attempts to preserve evidence as protected under Title VII and Section 701 of Michigan's Elliott-Larsen Civil Rights Act.

50. Thus, for purposes of this Complaint, the Plaintiffs consider the investigation pertaining to and stemming from the Jones' complaint/notice to include all such investigation(s) pertaining to and stemming from the Jones' complaint/notice even after Leadford and Abbey announced on June 13, 2023 that the investigation was over.

51. As part of the investigation, Haskins, Abbey, Leadford, and/or another City Human Resources employee conducted interviews of Jones, Kissel, and some select others employed by the City's Police Department.

52. Leadford oversaw the investigation for the City and generally conducted most of the interviews.

53. Prior to his wrongful termination, Jones was interviewed several times and at length as part of this investigation.

54. In early May 2023, and among other things, Jones revealed as part of these interviews (A) Ross' unjustifiably preferential treatment of Officer #1 and (B) his understanding of the information Piazza had learned at the Red Wings' game.

55. After June 13, 2023, Kissel was also interviewed as part of the investigation and also provided information concerning Ross' unjustifiably

preferential treatment of Officer #1 as well as the inappropriate and possibly physically intimate relationship between Ross and Officer #1.

56. On or about June 6, 2023, Ross announced that Officer #1 was being promoted to Sergeant.

57. Based on her knowledge of the inappropriate relationship between Ross and Officer #1, and in opposition to what she believed to be a promotion stemming from the violation of laws prohibiting sex discrimination and/or sexual harassment, Piazza sent a negative email about the promotion.

58. This prompted Ross to speak to Kissel about the email with Kissel initially to speak to Piazza about her email consistent with Kissel's responsibilities.

59. Yet, on June 7, 2023, Ross changed how this issue was going to be approached.

60. Ross informed Kissel that he would take care of this issue instead of Kissel.

61. Kissel spoke to Ross about this and asked why Ross was taking over his responsibility.

62. Ross responded that Leadford told him to do the interview of Piazza because she may bring up information related to the investigation that Leadford was conducting, namely the investigation about the relationship between Ross and Officer #1.

63. Nonetheless, this direction was consistent with a conversation between Abbey and Jones regarding the investigation wherein Abbey stated that "leaks" about the relationship between Ross and Officer #1 had to be stopped.

64. To Kissel, this was wildly inappropriate and possibly illegal.  Not only were his responsibilities being curtailed, but they were also being curtailed in such a way that (A) a subject of an investigation was going to interview a witness to the matter being investigated, (B) this subject of the investigation also appeared to already have knowledge of what the witness was expected to say, and (C) the intent of doing this appeared to be to conceal damaging information about the relationship between Ross and Officer #1.

65. Regardless, Ross and Abbey met with Piazza and her union representative and interviewed her.

66. During the interview, Piazza said that the reason she sent the email was because of what was going on between Ross and Officer #1.

67. Piazza also stated that this was based on things that she had heard and seen.

68. Despite the reference to what she had seen, Ross and Abbey appeared to be disinterested in this and pressed Piazza on what she had heard from others.

69. Further, as the interview progressed, Ross was clearly angry, was raising his voice, and was clearly hostile to Piazza about the answers she gave.

70. At one point, Piazza emphasized that the comment in her email was primarily based on things that she had seen at the hockey game in December.

71. Still, Ross and Abbey steadfastly ignored this and the other references to what Piazza had "seen" at the hockey game in December.

72. Ultimately, Ross informed Piazza that she was to stay home due to a list of things that she would be informed of on Friday, June 9th.

73. On June 9, 2023, Piazza met with Ross, Abbey, and her two union representatives.

74. At the beginning of the meeting, Ross implicitly threatened Piazza by stating that Piazza had purportedly committed some unspecified felony for which she could purportedly be charged.

75. Ultimately, the result of the meeting was that Ross suspended Piazza for two (2) weeks without pay for a list of purported City Police Department policy violations.

76. Importantly, neither Leadford nor Haskins ever interviewed Piazza as a part of the City's investigation despite the highly relevant information that she possessed and the fact that at least Jones had advised Leadford and Abbey of such information.

77. Unfortunately, this was not surprising.  The City's investigation pertaining to and stemming from the Jones' complaint/notice as well as the related

investigation of Piazza's email were unfair and unjust in various substantive and procedural ways including, but not necessarily limited to, the following:

(A) Substantively, the Defendants instigated, pursued, and/or perverted the investigations for unfair and unjust reasons and purposes, including, but not necessarily limited to, the following:

(1) Preventing "leaks" and concealing information that could be damaging to one or more of the Defendants and/or to Officer #1;

(2) "Clearing" Ross and/or Officer #1 of any wrongdoing regardless of the truth of any of the evidence and allegations related to them and/or to their relationship;

(3) Retaliating against and silencing any whistleblowers, including, but not limited to, Jones, Piazza, and Kissel, as well as any potential whistleblowers; and/or

(4) Imposing a narrative pertaining to this matter and countering any conflicting narrative regardless of any such narrative's truth.

(B) Procedurally, the Defendants instigated, pursued, and/or perverted the investigations in unfair and unjust ways, including, but not necessarily limited to, the following:

(1) Intentionally failing and/or refusing to record interviews and/or to preserve evidence;

(2) Intentionally failing and/or refusing to interview individuals who were identified as witnesses during one or more of the investigations or interviews;

(3) Intentionally failing and/or refusing to interview individuals who came forward as witnesses and/or accusing such individuals of untruthfulness and/or fabrication where such allegations could be especially damaging to any person with a career in law enforcement;

(4) Steadfastly ignoring Piazza's references in her interview to what Piazza had "seen" generally or at the hockey game in December;

(5) Sharing between themselves, and thus with a subject of a related investigation (namely Ross), what a witness (namely Piazza) was expected to say in her interview about the matters being investigated;

(6) Having the same subject of the investigation conduct an interview of the same witness knowing what the witness was expected to say about the matter;

(7) Having the same subject of the investigation who was conducting the interview avoid relevant information for one or more of the unfair and unjust purposes noted above;

(8) Threatening and/or intimidating one or more witnesses, including, but not limited to, each of the Plaintiffs; and/or

(9) Representing to one or more of the Plaintiffs, to the City's City Council, and/or to the public that the investigation the Defendants were going to conduct or

had conducted was going to be and/or was an "independent" investigation, although this was impossible given Leadford's ethical obligations to the City as an attorney representing the City, including, but not limited to, a duty of loyalty to the City and/or an obligation to be a zealous advocate for the City.

78. On June 12, 2023, Jones was put on paid administrative leave but was not told why this was being done.

79. On June 13, 2023, Leadford and Abbey announced at a meeting of City Police Department employees that the investigation was over and the allegations were unfounded.

80. However, as explained above, the City's investigation pertaining to and stemming from the Jones' complaint/notice continued with a perverted purpose and in perverted ways.

81. On June 19, 2023, the BCOG sent a letter to the City's City Council, Haskins, and Abbey regarding the BCOG's "Vote of No Confidence in Burton Police Chief Brian Ross".

82. Generally, the letter was critical of Ross and his performance as the City's Police Chief.

83. However, the letter also specifically stated criticisms related to the Defendants' handling of Jones' complaint/notice and the investigation of same.

84.  On June 21, 2023, the Patrol Officers' union overwhelmingly adopted its own vote of no confidence with respect to Ross.

85. Also on June 21, 2023, Ross went on social media and posted his response to at least some of the issues pertaining to his leadership as raised by the votes of no confidence.

86. On June 22, 2023, the City's City Council conducted a special meeting related to the BCOG's letter and/or the vote(s) of no confidence with respect to Ross.

87. At this meeting, Kissel made statements as the President of the BCOG advocating his union's position with respect to the BCOG's letter and its vote of no confidence.

88. The Defendants were aware of Kissel's statements and actions.

89. On or about June 29, 2023, the Defendants sent the BCOG, Jones, Kissel, and/or another member of the BCOG charges pretextually accusing them of various City Police Department policy violations for which they were going to be subject to discipline.

90. On July 7, 2023, the Defendants via Haskins respectively imposed the following discipline on these individuals:

(A) Jones was terminated.

(B) Kissel was double demoted without eligibility for future promotion.

16

(C) The other employee was reprimanded.

91. The Plaintiffs' speech, statements, communications, associations, and/or actions were on or related to matters of a public concern where (A) they were made in or concerned the investigations of sexual improprieties and/or sexual harassment related to Ross and Officer #1 as well as any related investigation(s),  (B) they included Piazza's email message expressing her opposition to Officer #1's promotion based on Officer #1's inappropriate relationship with Ross, and (C) they included Kissel's statements made at the City Council meeting as the President of the BCOG as well as his advocacy in this role for the BCOG's letter and the vote of no confidence.

92. Additionally, by virtue of the same speech, statements, communications, associations, and/or actions, the Plaintiffs did report violations or suspected violations of law to one or more public bodies, including all of the Defendants.

93. Further, each of the Plaintiffs had been requested by a public body to participate in at least one investigation which is where much of the same speech, statements, communications, associations, and/or actions were made or took place.

94. Moreover, each Plaintiff's speech, statements, communications, associations, and/or actions related to the propriety of Ross and Officer #1's relationship as well as related to or arose from the investigations of preferential treatment, sexual discrimination and/or improprieties, and/or sexual harassment

stemming from that relationship.  Thus, all such speech, statements, communications, associations, and/or actions were protected by Title VII as well as by Section 701 of Michigan's Elliott-Larsen Civil Rights Act.

95. The Defendants subjected the Plaintiffs to the adverse actions described above, including the termination of Jones, the double demotion of Kissel without eligibility for future promotion, and the implicit threat to and the two-week suspension without pay of Piazza.

96. The Defendants subjected the Plaintiffs to these adverse actions in at least significant part if not solely due to the Plaintiffs' above speech, statements, communications, associations, statuses, and/or actions that were protected under the United States Constitution, the Michigan Constitution, the laws of the United States, and/or the laws of the State of Michigan.

97. Therefore, the adverse actions taken against the Plaintiffs by the Defendants were contrary to the United States Constitution, the Michigan Constitution, and the laws of the United States of America and the State of Michigan.

## COUNT I: DEPRIVATION OF THE PLAINTIFFS' FEDERAL CIVIL RIGHTS AS TO ALL DEFENDANTS

98. The Plaintiffs incorporate paragraphs 1 through 97 above by reference.

99. This Count is brought pursuant to 42 USC 1983.

100. The adverse actions taken by the Defendants against the Plaintiffs as described above were taken under color of state law.

101. The adverse actions stemmed from purposeful discrimination, purposeful retaliation, and/or from the City's policy(ies) and/or custom(s).  This includes, but is not necessarily limited to, actions taken by Haskins and/or Ross as the City's final policymaker(s) for purposes of establishing the City's policy(ies) and/or custom(s).

102. The adverse actions violated the Plaintiffs' 1st Amendment rights to freedom of association, to freedom of speech and/or expression, and/or to petition government for the redress of grievances in that they were done in at least significant part if not solely due to the Plaintiffs' statements, actions, associations, and/or activities that were protected under the 1st Amendment.

103. As a direct and proximate result of the Defendants' violations of the Plaintiffs' rights, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

(a)  Loss of income;

(b)  Loss of fringe benefits;

(c)  Loss of pension and/or Social Security benefits;

(d)  Severe mental anguish and distress;

(e)  Embarrassment and humiliation;

(f) Mental anguish stemming from the outrage they experienced as a result of the actions against them;

(g) Fright, shock, and mortification;

(h) Pain and suffering;

(i) Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages; and

(l) Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding each of them an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including reinstatement and/or expungement of false information from their personnel files/records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

## COUNT II: VIOLATION OF RIGHTS UNDER THE WHISTLEBLOWERS' PROTECTION ACT AS TO ALL DEFENDANTS

104. The Plaintiffs incorporate paragraphs 1 through 103 above by reference.

105. Under the Whistleblowers' Protection Act ("WPA"), the Defendants

were and/or are "employers" for all times material to this Complaint.

106. Under the WPA, each Defendant was also a "public body" for all times material to this Complaint.

107. Under the WPA, each Plaintiff was an "employee" for all times material to this Complaint.

108. The adverse actions taken by the Defendants against the Plaintiffs as described above were taken in at least significant part if not solely (A) due to the Plaintiffs' report(s) of violations or suspected violations of the law to at least one public body and/or (B) because each Plaintiff was an employee who was requested by a public body to participate in an investigation, hearing, or inquiry held by that public body.

109. The Defendants thus violated the WPA.

110. As a direct and proximate result of the Defendants' violations of the Plaintiffs' rights, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

(a) Loss of income;

(b) Loss of fringe benefits;

(c) Loss of pension and/or Social Security benefits;

(d) Severe mental anguish and distress;

(e) Embarrassment and humiliation;

(f) Mental anguish stemming from the outrage they experienced
as a result of the actions against them;

(g) Fright, shock, and mortification;

(h) Pain and suffering;

(i) Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages; and

(l) Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding each of them an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including reinstatement and/or expungement of false information from their personnel files/records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

## COUNT III:  RETALIATION IN VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT ("ELCRA") AS TO ALL DEFENDANTS

111. The Plaintiffs incorporate paragraphs 1 through 110 above by reference.

112. Each Defendant was a "person" within the meaning of the Elliott-Larsen Civil Rights Act ("ELCRA").

113. The Defendants violated Section 701 of the ELCRA, specifically MCL 37.2701(a) and (f), by taking the adverse actions they did against the Plaintiffs as described above.

114. The Defendants violated the ELCRA by taking the adverse actions against the Plaintiffs as described above in at least significant part if not solely because (a) they had engaged in the above protected activity and/or (b) in order to interfere with their exercise or enjoyment of rights granted by the ELCRA.

115. As a direct and proximate result of the Defendants' violations of the Plaintiffs' rights, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

    (a)  Loss of income;

    (b)  Loss of fringe benefits;

    (c)  Loss of pension and/or Social Security benefits;

    (d)  Severe mental anguish and distress;

    (e)  Embarrassment and humiliation;

    (f)  Mental anguish stemming from the outrage they experienced as a result of the actions against them;

    (g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j)  Liquidated damages;

(k)  Punitive damages; and

(l)  Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding each of them an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including reinstatement and/or expungement of false information from their personnel files/records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

<u>COUNT IV: VIOLATION OF FAIR AND JUST TREATMENT<br>CLAUSE OF MICHIGAN CONSTITUTION AS TO ALL DEFENDANTS</u>

116. The Plaintiffs incorporate paragraphs 1 through 115 above by reference.

117. This Count is brought pursuant to Article I, Section 17 of the Michigan Constitution of 1963.

118. Article I, Section 17 of the Michigan Constitution of 1963 guarantees all individuals the right to fair and just treatment in the course of legislative and executive investigations and hearings.

119. The adverse actions taken by the Defendants against the Plaintiffs as noted above were taken under color of state law.

120. The adverse action stemmed from purposeful discrimination, purposeful retaliation, and/or from the City's policy(ies) and/or custom(s). This includes, but is not necessarily limited to, actions taken by Haskins, Leadford, and/or Ross as the City's final policymaker(s) for purposes of establishing the City's policy(ies) and/or custom(s).

121. The adverse action violated Article I, Section 17 of the Michigan Constitution of 1963 in that the Defendants have violated the Plaintiffs' right to fair and just treatment in the investigations noted above in ways including, but not necessarily limited to, the following:

(A) Substantively, the Defendants have violated the Plaintiffs' rights in that the investigations were instigated, pursued, and/or perverted for unfair and unjust reasons and purposes as described above. Further, the investigations were otherwise substantively unfair and unjust.

(B) Procedurally, the Defendants have violated the Plaintiffs' rights in that the investigations were pursued in unfair and unjust ways as described above. The

Defendants' actions violated the general rules of procedure typically applicable to judicial processes and other quasi-judicial processes.  Further, the investigations were otherwise procedurally unfair and unjust.

122. As a direct and proximate result of the Defendants' violations of the Plaintiffs' rights, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

(a)  Loss of income;

(b)  Loss of fringe benefits;

(c)  Loss of pension and/or Social Security benefits;

(d)  Severe mental anguish and distress;

(e)  Embarrassment and humiliation;

(f)  Mental anguish stemming from the outrage they experienced as a result of the actions against them;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j)  Liquidated damages;

(k)  Punitive damages; and

(l)  Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding each of them an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including reinstatement and/or expungement of false information from their personnel files/records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

DATED: September 5, 2023          /s/ GARY T. MIOTKE
                                 GARY T. MIOTKE (P41813)
                                 Attorney for Plaintiffs